# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KEITH NELSON                  :
Register Number            :
U.S. Penitentiary Terre Haute   :
Terre Haute, IN 47802       :
                            :

          Plaintiff,        :
                            :

      v.                    :        Case Number _____
                            :

WILLIAM P. BARR         :
U.S. Department of Justice    :
950 Pennsylvania Avenue, NW :
Washington, DC 20530;     :
                            :

KATHLEEN HAWK SAWYER :
Acting Director            :
Federal Bureau of Prisons    :
U.S. Department of Justice    :
320 First St., NW         :
Washington, DC 20534;     :
                            :

JEFFREY E. KRUEGER    :
Regional Director         :
Federal Bureau of Prisons    :
North Central Region      :
U.S. Department of Justice    :
400 State Avenue, Suite 800  :
Kansas City, KS 66101;     :
                            :

JOSEPH McCLAIN        :
United States Marshal     :
Southern District of Indiana   :
U.S. Courthouse         :
46 E. Ohio Street, Room 179  :
Indianapolis, IN 46204;     :
                            :

NICOLE C. ENGLISH     :
Acting Assistant Director    :
Health Services Division    :
Federal Bureau of Prisons    :
320 First St., NW         :

1

Washington, DC 20534;                          :
                                               :
T.J. WATSON                                    :
Complex Warden                                 :
U.S. Penitentiary Terre Haute                  :
4700 Bureau Road South                         :
Terre Haute, IN 47802;                         :
                                               :
WILLIAM E. WILSON, M.D.                         :
Clinical Director                              :
U.S. Penitentiary Terre Haute                  :
4700 Bureau Road South                         :
Terre Haute, IN 47802;                         :
                                               :
UTTAM DHILLON                                   :
Acting Administrator                           :
U.S. Drug Enforcement Administration           :
2401 Jefferson Davis Highway                   :
Alexandria, VA 22301                           :
                                               :
and                                            :
                                               :
JOHN DOES I-X,                                 :
                                               :
Individually                                   :
and in their official capacities,             :
                                               :
                    Defendants.                :

## COMPLAINT FOR INJUNCTIVE & DECLARATIVE RELIEF

### I.    Nature of Action

1.     Plaintiff Keith Nelson brings this action seeking injunctive and declaratory relief

for: (a) violations and threatened violations of his right to due process under the Fifth

Amendment of the U.S. Constitution; (b) violations and threatened violations of his right under

the Eighth Amendment of the U.S. Constitution to be free from cruel and unusual punishment;

(c) violations and threatened violations of his right of access to counsel under the First, Fifth, and

2

Sixth Amendments of the U.S. Constitution; and (d) violations and threatened violations of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA").

2.      Mr. Nelson was sentenced to death under the Federal Death Penalty Act, 18 U.S.C. § 3591 *et seq.* ("FDPA").  Defendants include the individuals charged with carrying out Mr. Nelson's death sentence.

3.      On July 25, 2019, the United States Department of Justice ("DOJ") announced that executions of federal prisoners, including Mr. Nelson, will be administered by the Federal Bureau of Prisons ("BOP") using a revised addendum to the BOP Execution Protocol (the "2019 Addendum") that provides that all federal executions will be conducted via a uniform procedure utilizing injection of a single dose of sodium pentobarbital ("pentobarbital"), a controlled substance under the Controlled Substances Act ("CSA").  21 U.S.C. § 801, *et seq.*   On November 13, 2019, the DOJ publicly filed the Administrative Record, which included a revised 2019 BOP Execution Protocol that replaced the prior version.  (The 2019 BOP Execution Protocol and the 2019 Addendum are referred to collectively as the "2019 Protocol.")

4.      Unless Mr. Nelson's conviction or sentence is overturned, he will be executed by Defendants, who on information and belief will carry out the execution under the provisions of the 2019 Protocol.

5.      As described more fully below, the implementation and use of the 2019 Protocol violates Mr. Nelson's rights under the First, Fifth, Sixth, and Eighth Amendments of the U.S. Constitution and the APA.

6.      Accordingly, Mr. Nelson seeks the following relief in this action: (a) a preliminary and permanent injunction preventing the Defendants from executing him pursuant to

the 2019 Protocol; (b) an order declaring that the implementation or use of the 2019 Protocol

violates the rights of Mr. Nelson under the First, Fifth, Sixth, and Eighth Amendments to the

U.S. Constitution; (c) an order declaring that the adoption and use of the 2019 Protocol violates

the APA and the CSA; and (d) such other equitable relief as this Court deems just and proper.

7.      The claims in this Complaint are cognizable under the constitutional and statutory

grounds identified herein and described in more detail below.  This action is not, and should not

be treated as, a successor petition for habeas corpus petition.  Mr. Nelson is not challenging

through this action the validity of his conviction or death sentence.  Rather, Mr. Nelson asserts

that the 2019 Protocol, by which -- upon information and belief -- his execution is to be

implemented, violates the Constitution, the APA, and other applicable laws.

## II.      Parties

8.      Mr. Nelson is a United States citizen who has been sentenced to death under the

FDPA.  Mr. Nelson is incarcerated at the United States Penitentiary in Terre Haute, Indiana

("USP Terre Haute") under the control and supervision of the BOP, an agency within the DOJ.

Under the 2019 Protocol, the execution of Mr. Nelson will be administered at USP Terre Haute.

9.      Defendant William P. Barr is the Attorney General of the United States.  Mr.

Nelson was remanded into Attorney General Barr's custody upon Mr. Nelson's conviction and

the imposition of his death sentence.  Under the FDPA, Attorney General Barr is the executive

responsible for carrying out sentences of death against federal prisoners.  Attorney General Barr

is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

10.     Defendant Kathleen Hawk Sawyer is the Acting Director of the BOP.  Ms. Hawk

Sawyer is responsible for prescribing and directing the promulgation of rules and regulations for

the BOP, including rules and regulations for the conduct of prison operations and executions. Ms. Hawk Sawyer is sued here in her official capacity for the purpose of obtaining declaratory and injunctive relief.

11.     Defendant Jeffrey E. Krueger is the Regional Director of the North Central Region of the BOP. Mr. Krueger is responsible for operations at USP Terre Haute, and plays a role in the promulgation of rules and regulations for USP Terre Haute, including rules and regulations for the conduct of prison operations and executions.  Mr. Krueger is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

12.     Defendant Joseph McClain is the U.S. Marshal for the Southern District of Indiana.  Mr. McClain will supervise the implementation of Mr. Nelson's death sentence.  Mr. McClain is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

13.     Defendant Nicole C. English is the Acting Assistant Director, Health Services Division, of the BOP.  Ms. English is responsible for overseeing the provision of medical care to prisoners at all BOP facilities, including USP Terre Haute, and for promulgating and implementing BOP policies with respect to medical care provided by the BOP.  Ms. English is sued here in her official capacity for the purpose of obtaining declaratory and injunctive relief.

14.     Defendant T.J. Watson is the Complex Warden of USP Terre Haute.  Mr. Watson is responsible for the management, oversight and operations at USP Terre Haute, including the oversight and implementation of executions.  Mr. Watson is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

15.     Defendant Uttam Dhillon is the Acting Administrator of the U.S. Drug Enforcement Agency ("DEA").  In that role, Mr. Dhillon is responsible for overseeing all controlled substances, including pentobarbital (a Schedule II drug under the CSA).  Mr. Dhillon is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

16.     Defendants John Does I–X are responsible for or will be directly or indirectly involved in carrying out the execution of Mr. Nelson, including without limitation individuals employed or retained by the BOP to consult with, prepare for and/or carry out Mr. Nelson's execution, and individuals or entities who will manufacture, compound, supply or prepare drugs or drug products to be used in the execution. Mr. Nelson does not know, and neither Attorney General Barr nor the BOP Defendants have revealed their identities or positions. John Does I-X are sued here in their official capacities for the purpose of obtaining declaratory and injunctive relief.

17.     Upon information and belief, unless preliminarily and permanently enjoined, each of the Defendants intends to act in his or her official capacity and under the authority of federal law in executing Mr. Nelson, in violation of Mr. Nelson's constitutional and/or statutory rights.

### III.     Jurisdiction and Venue

18.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because this action arises and seeks relief under the laws and Constitution of the United States, specifically, the First, Fifth, Sixth, and Eighth Amendments of the U.S. Constitution, the APA, 5 U.S.C. §§ 702, 704, 705, and 706, and 28 U.S.C § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief).

6

19.     Venue is proper under 28 U.S.C. § 1391(b)(2) because the BOP headquarters is in this District and a substantial part of the events giving rise to the claims made by Mr. Nelson, including the formulation of the 2019 Protocol, took place and continue to take place in this District.

## IV.     Exhaustion of Administrative Remedies

20.     Mr. Nelson does not believe that exhaustion is necessary under the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e, because this suit does not challenge prison conditions, and because there are no available administrative remedies that could address the challenged constitutional violations. Despite the inapplicability of the PLRA, Mr. Nelson has completed the administrative grievance process and exhausted his administrative remedies.

21.     Mr. Nelson began to exhaust his informal and formal administrative remedies to challenge the 2019 Protocol on August 12, 2019.

22.     On August 12, 2019, Mr. Mr. Nelson initiated the administrative grievance process by filing an informal complaint with his Correctional Counselor. Mr. Nelson requested that the BOP modify the 2019 Protocol to cure violations to his First, Fifth, Sixth, and Eighth Amendments to the Constitution and promulgate the execution protocol in accordance with the APA.

23.     His correctional counselor provided no relief and Mr. Nelson continued the administrative grievance process by submitting a Form BP-9 to the Warden of USP Terre Haute on August 16, 2019. Form BP-9 restated the request for relief from the informal complaint. On August 22, 2019, Mr. Nelson's BP-9 grievance was denied.

24.     On August 27, 2019, Mr. Nelson submitted form BP-10, an appeal to the denial by the Warden, to the Regional Office for relief. The Regional Office did not provide relief to Mr. Nelson. On October 29, 2019, Mr. Nelson appealed the denial by the Regional Office and submitted form BP-11 to the Central Office. On December 30, 2019, Mr. Nelson received notice that his BP-11 had been denied.  Thus, Mr. Nelson's administrative remedies have been exhausted.

## V.     Factual Background

### A.     Mr. Nelson's Conviction and Sentence and Post-Conviction Procedural History

25.     In October 2001, Mr. Nelson pleaded guilty to kidnapping resulting in the death of the victim in violation of 18 U.S.C. § 1201(a)(1), and (g) (1994). Plea Agreement, *United States v. Nelson*, No. 99-CR-00303-FJG (W.D. Mo. Oct. 25, 2001), Dkt. No. 338.[1] On March 12, 2002, Mr. Nelson was sentenced to death by the District Court for the Western District of Missouri pursuant to the FDPA.  *United States v. Nelson*, No. 99-CR-00303-FJG (W.D. Mo. Mar. 12, 2002), Dkt. No. 442.

26.     On October 22, 2003, the United States Court of Appeals for the Eighth Circuit affirmed Mr. Nelson's conviction and sentence.  *United States v. Nelson*, 347 F.3d 701, 701 (8th Cir. 2003).  On November 8, 2004, the United States Supreme Court denied Mr. Nelson's petition for a writ of certiorari. *Nelson v. United States*, 543 U.S. 978, 978 (2004).

27.     Subsequently, Mr. Nelson filed a motion to vacate, set aside, or correct his sentence in the Missouri District Court pursuant to 28 U.S.C. § 2255. Mot. to Vacate, *Nelson v. United States*, No. 04-CV-08005-FJG (W.D. Mo. Nov. 6, 2005).  Ultimately, after a remand by

---

[1] Documents that were filed non-electronically are cited with the convention, "Dkt. No." Documents that were filed electronically are cited by their "ECF No."

the Eighth Circuit, the district court denied relief. *Nelson v. United States*, 97 F. Supp. 3d 1131, 1135 (W.D. Mo. 2015).

28.     The Eighth Circuit affirmed the district court's denial of § 2255 relief to Mr. Nelson. *Nelson v. United States*, No. 15-3160 (8th Cir. Nov. 28, 2018), Entry 4730179.

29.     On August 8, 2019, Mr. Nelson filed a petition for a writ of certiorari and a motion for leave to proceed *in forma pauperis* to the United States Supreme Court. Pet. for a Writ of Cert., *Nelson v. United States*, No. 19-5568 (U.S. Aug. 8, 2019).  That petition is currently pending.

**B.     The History of Federal Lethal Injection Protocol**

30.     Beginning in 1937, Congress required federal executions to be conducted in the manner prescribed by the state of conviction. *See* 50 Stat. § 304 (former 18 U.S.C. 542 (1937)), recodified as 62 Stat. § 837 (former 18 U.S.C. 3566).

31.     After the Supreme Court decision in *Gregg v. Georgia*, 428 U.S. 153 (1976), Congress reinstated the death penalty for certain federal crimes but did not specify a procedure for implementation.

32.     On February 18, 1993, the DOJ issued a set of regulations, referred to as the "Final Rule," that purported to establish a protocol for carrying out the executions of prisoners "sentenced to death for commission of an offense described in any federal statute." 28 C.F.R. § 26.1.  The Final Rule provided that executions would take place at a federal prison by "intravenous injection of a lethal substance."  The Final Rule provided little detail and did not identify the drug or drugs to be used in executions.

33.    In 1994, Congress enacted the FDPA establishing that federal death sentences shall be implemented as follows:

> When the [death] sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law.

18 U.S.C. § 3596(a).

34.    The FDPA provides no exceptions to the foregoing rule and does not provide or contemplate the establishment of a separate federal execution procedure.

35.    The FDPA also does not grant any authority to the BOP to create a federal execution protocol, set dates or carry out execution. The FDPA grants sole authority to the United States Marshal to execute death sentences.

36.    Following enactment of the FDPA, the DOJ and BOP supported proposed legislation to amend the FDPA to grant authority to the BOP to carry out executions under their own procedures.  However, none of those proposed amendments were enacted by Congress, and the FDPA continues to require the federal government to carry out executions in the manner prescribed by the law of the state of conviction.

37.    In 2004, the DOJ, without notice or comment, adopted a new BOP Execution Protocol for carrying out federal death penalty sentences (the "2004 Protocol").  The 2004 Protocol included additional detail about how executions would be administered, but, like the Final Rule, was silent about the drug or drugs to be used in executions.

10

38.     The 2008 Addendum to the BOP Execution Protocol specified that executions would be carried out using three drugs: sodium pentothal, pancuronium bromide, and potassium chloride. (The 2004 Protocol and 2008 Addendum will collectively be referred to as the "2008 Protocol.")

39.     In May 2011, the BOP announced that it did not have the drugs necessary to implement the 2008 Protocol and was considering revisions to the execution protocol.  At the time of the 2011 announcement, several lawsuits challenging the 2008 Protocol were pending in this Court.  After the announcement by the BOP that it was unable to implement the 2008 Protocol, those litigations were stayed.  In the years that followed, the BOP continued to issue status reports stating that revisions to the federal execution protocol were ongoing.  *See* Joint Mot., *Roane v. Holder*, No. 05-2337 (D.D.C. May 24, 2011), Dkt. No. 286. Thereafter, the BOP submitted status reports in the lethal-injection cases stating that the protocol revision was ongoing. *See, e.g.*, Status Report, *Roane*, No. 05-2337 (D.D.C. Sept. 1, 2011), Dkt. No. 289. Until recently, the BOP has continued to file similar status reports regarding its continuing review of the 2008 Protocol. *See, e.g.*, Status Report, *Roane*, No. 05-2337 (D.D.C. May 1, 2019), Dkt. No. 383.

40.     Mr. Nelson did not file an action earlier challenging the 2008 Protocol because, for the past eight years, the BOP did not have an operative execution protocol, and it was unclear if, or when, an operative protocol would be adopted, and, if so, what any such protocol would provide.

41.     On July 25, 2019, the DOJ issued a press release announcing the scheduling of the execution of five prisoners at the USP Terre Haute with dates between December 9, 2019, and

January 15, 2020. DOJ Office of Public Affairs, Federal Government to Resume Capital

Punishment After Nearly Two Decade Lapse, July 25, 2019,

https://www.justice.gov/opa/pr/federal-government-resume-capital-punishment-after-nearly-two-

decade-lapse.

  42. On the same day, the DOJ announced that, at the direction of Attorney General

Barr, the BOP had adopted the 2019 Addendum to the BOP Execution Protocol.  On November

13, 2019, BOP publicly filed the revised 2019 BOP Execution Protocol, which replaced the 2008

BOP Execution Protocol.  The 2019 Protocol replaced the previous three-drug procedure with a

procedure using a single dose of pentobarbital and removed other key provisions including a

provision detailing a plan for unexpected occurrences during executions.

  43. The 2019 Protocol was adopted by the DOJ without any advance notice.  Between

the BOP's May 2011 announcement that it was unable to implement the 2008 Protocol and the

July 25, 2019 announcement of the 2019 Protocol, neither the DOJ nor the BOP provided any

information to the public or to Mr. Nelson or any of the other prisoners sentenced to death under

federal law about the process or details of any revisions to the execution protocol that were

planned or under discussion or consideration.

  44. Moreover, neither the DOJ nor the BOP followed the rule-making process under

the APA, which requires an agency to publish proposed rules in advance of adoption and allows

the public an opportunity to comment on such policy changes before they are put into place. *See,*

*e.g.,* 5 U.S.C. § 553.

  45. As alleged below, 28 C.F.R. Part 26 does not apply to death sentences imposed

under the FDPA. If, however, there is a later determination that 28 C.F.R. Part 26 does apply to

Mr. Nelson's execution, the execution could not go forward under that regulation because the DOJ and BOP have failed to comply with its notice requirements.

### C.   Lethal Injections under the 2019 Protocol

#### i.  Issues with Pentobarbital

46.     Pentobarbital is a barbiturate that affects the activity of the brain and nervous system. It is clinically indicated for use as a pre-anesthetic, a sedative, and for treatment of brain-swelling, seizures and insomnia. According to the expert testimony of William Ebling, Ph.D., in *Ayala et al. v. Davis et al.*, Case 3:06-cv-00219-RS (N.D. Cal.), pentobarbital can cause an individual to be in a "never-never land in between wakefulness and sleep with an obstructed airway bubbling away … and with all kinds of secretions … it's not pretty." (Fifth Am. Compl., dated Feb. 27, 2019, Dkt. No. 710, ¶ 223.)

47.     Pentobarbital has an alkaline pH that is significantly higher than normal blood pH.  If inadvertently injected into tissue other than a vein (such as by insufficiently trained personnel), pentobarbital causes tissue damage and severe pain.

48.     IV injection of a high-dose of pentobarbital also leads to "flash" pulmonary edema. Autopsies performed of prisoners who were executed with a single-drug use of pentobarbital have confirmed the presence of pulmonary edema.

49.     Pulmonary edema is extremely painful and, a leading expert, Dr. Mark Edgar, has described it as follows:

> Pulmonary edema has a variety of effects on the body. First, the presence of fluid in airspaces (alveolar sacs) interferes with normal gas exchange, which reduces the amount of oxygen in the blood. It also increases the work of breathing; in mild cases, this causes shortness of breath, sometimes coughing or wheezing, and increase in the rate of breathing, but with increasing severity it greatly

13

> increases the work of breathing such that the chest muscles and diaphragm strain as they expend greater effort to move air into the lungs. This also produces sensations similar to drowning or asphyxiation as fluid occupies a greater volume of the air spaces. Severe pulmonary edema is an intolerable state that produces panic and terror.

(*In re Ohio Execution Protocol Litig.*, 2:11-cv-1016 (S.D. Ohio) (the "*Ohio Protocol* Action"), Expert Report of Dr. Mark Edgar, Dkt. No. 2035-1, ¶ 12.)[2]

50.   Onset of flash pulmonary edema can develop immediately following the IV administration of pentobarbital, which creates a substantial risk of severe pain.

51.   The 2019 Protocol includes minimal and inadequate information.  It provides no specific information about the pentobarbital the DOJ and BOP intend to use in executions, beyond the fact that the drug is pentobarbital and that five grams will be administered through an IV.  The 2019 Protocol does not contain any safeguards to ensure that only properly identified pentobarbital will be used, and that the drug used will be tested to ensure proper identity, purity, potency and efficacy and, if so, at what interval.

52.   In the Administrative Record, the BOP indicated that it has obtained pentobarbital active pharmaceutical ingredient ("API") from a domestic manufacturer and has identified a compounding pharmacy to store the API and compound an injectable form of the drug.  *See* Administrative Record at 872.   The BOP did not provide any additional information about the supplier of the API or the compounding pharmacy, including verification of licensure or whether the entities have been issued any FDA warnings or other disciplinary actions have been taken.

---

[2] The court in the Ohio Protocol Action accepted Dr. Edgar's testimony, finding that "pulmonary edema itself certainly or very likely causes severe pain and needless suffering." (Decision and Order on Motion for Stay of Execution and Prelim. Inj., dated Jan. 14, 2019, Dkt. No. 2133, at 131.)

53.     The Administrative Record also contained several highly-redacted pages of lab testing reports, a few of which indicated the substance tested did not meet the requisite standards. It is unclear from the record whether these test results relate to the specific drugs that will be used in executions. There is no provision in the 2019 Protocol requiring the BOP to test the compounded execution drugs prior to executions and whether those results will be provide to condemned prisoners.

54.     Compounded drugs are not FDA-approved, and are subject to less rigorous regulation and oversight relating to the identity, purity and potency of the drug. For these reasons, there is a substantial risk that the drug will be contaminated, handled improperly or sub-potent. *See, e.g.,* Jill McCullough, *Will Texas Have to Push Back the Expiration Dates on its Lethal Injection Drugs?,* Texas Tribune (May 17, 2018), www.texastribune.org/2018/05/17/texas-lethal-injection-drugs-are-set-expire-upcomingexecutions. If the pentobarbital has problems with identity, purity and potency, there is a substantial risk that its use would result in painful or botched executions. For example, five people who were executed in Texas through the use of pentobarbital complained that they felt as if they were burning before they finally died. Chris McDaniel, *Inmates Said the Drug Burned as They Died. This is How Texas Gets its Execution Drugs, supra.* In another instance, Georgia cancelled a 2015 execution because the compounded pentobarbital developed problems that rendered it unusable. Erica Hunziger, *Secret Sedative: How Missouri Uses Pentobarbital in Executions*, St. Louis Public Radio (Aug. 18, 2017), https://news.stlpublicradio.org/post/secret-sedative-how-missouri-uses-pentobarbital-executions.

55.     Compounding facilities have had well-documented problems. Texas, for example, purchased its supply of pentobarbital from a compounding pharmacy (Greenpark) whose license was on probation for providing dangerous mixtures to children. Chris McDaniel, *Inmates Said the Drug Burned as They Died. This is How Texas Gets its Execution Drugs,* Buzzfeed News (Nov. 28, 2018), www.buzzfeednews.com/article/chrismcdaniel/inmates-said-the-drug-burnedas-they-died-this-is-how-texas. In addition, the FDA has warned Greenpark about "serious deficiencies in [its] practices for producing sterile drug products, which put patients at risk." FDA Center for Drug Evaluation and Research, *Warning Letter: Greenpark Compounding Pharmacy* (Oct. 26, 2018), www.fda.gov/inspections-complianceenforcement-and-criminal-investigations/warning-letters/greenpark-compounding-pharmacy-566233-10262018. Similarly, Missouri purchased pentobarbital for executions from a company (Foundation Care) that, according to a report from Buzzfeed News, has been repeatedly found to engage in hazardous pharmaceutical procedures. Chris McDaniel, *Missouri Fought For Years To Hide Where It Got Its Execution Drugs. Now We Know What They Were Hiding,* Buzzfeed News (Feb. 20, 2018), www.buzzfeednews.com/article/chrismcdaniel/missouri-executed-17-men-withdrugs-from-a-high-risk.

### ii.  Issues with Intravenous ("IV") Administration of Pentobarbital

56.     The 2019 Protocol also lacks sufficient procedures and safeguards to ensure that pentobarbital is properly administered.  Lethal-injection executions have been plagued by difficulties with setting IVs. The complaints in two other actions pending in this district, No. 05-2337 (D.D.C. filed Dec. 6, 2005), and *Bourgeois v. United States Dep't of Justice*, No. 1:12-cv-00782-TSC (D.D.C. filed May 15, 2012), provide details on the issues that have arisen.

57.     There have been several recent, significant examples of IV problems in lethal injections. For example, at the well-publicized Clayton Lockett execution in 2014, the femoral line was not placed correctly and he regained consciousness before dying. Erik Eckholm, *One Execution Botched, Oklahoma Delays the Next*, New York Times (April 29, 2014), https://www.nytimes.com/2014/04/30/us/oklahoma-executions.html. In addition, in Ohio (2017) and Alabama (2018), the personnel tried unsuccessfully for an extended period of time to set IVs in two very ill prisoners, Alva Campbell and Doyle Lee Hamm. *See* Tracy Connor, Alva Campbell, inmate who survived execution try, dies in Ohio Prison, NBC News (March 3, 2018), https://www.nbcnews.com/news/us-news/alva-campbell-inmatewho-survived-execution-try-dies-ohio-prison-n852961; Tracy Connor, *Doyle Lee Hamm Wished for Death During Botched Execution, Report Says*, NBC News (March 5, 2018), https://www.nbcnews.com/storyline/lethal-injection/doyle-lee-hamm-wished-death-during-botched-execution-report-says-n853706. Those two executions were called off as a result.

58.     Here, the 2019 Protocol states that the BOP Director (or his/her designee) will determine the method of IV access for an execution based on the training and experience of the personnel establishing the IV access, based upon a recommendation from qualified personnel or to comply with specific orders of federal courts. (§ H.)  No information is provided relating to the qualifications of the BOP Director to make this determination, the identity of these "qualified personnel" or the circumstances under which they would be present. Moreover, the protocol clearly contemplates that the training and experience of the execution team member placing the IVs can change from one execution to the next. There is no indication whether the prisoner's veins will be assessed as part of the determination of appropriate IV placement.

59.     Thus, the 2019 Protocol gives total discretion to the personnel involved in the execution, and it provides no guidelines with regard to the options and limitations for the IV placement. Can the execution team establish central line access? Can they perform a cut-down? Is there an order of preferred access sites? Is there a time limit for establishing IV access? Is there a limit on the number of times the team can attempt IV access? These critical questions are left unanswered in the 2019 Protocol.

### iii.  The 2019 Protocol Lacks Transparency Regarding Personnel and Procedures under the 2019 Protocol

60.     The same lack of transparency and guidelines applies as a general matter to the personnel and procedures under the 2019 Protocol.

61.     The preparation of drugs, particularly for IV use, is a technical task requiring significant training in pharmaceutical concepts and calculations. There are many risks associated with drug preparation that, if not properly addressed by credentialed and trained personnel, further elevate the risk that a person will experience excruciating pain during lethal injection. The correct and safe management of IV drug and fluid administration requires a high level of professional acumen, and cannot be performed adequately by personnel lacking the requisite training and experience.

62.     As alleged above, many of the problems relating to pentobarbital arose because of improper procedures, which illustrate the importance of well- trained and qualified personnel as well as the use of accepted, verifiable procedures.

63.     Rather than complying with the APA by supplying adequate information to Mr. Nelson and the public about the 2019 Protocol or by providing specific information about the source of the API and the compounding pharmacy, including confirming that execution drugs

18

will be tested and the results provided to the condemned prisoners, the DOJ and BOP have taken

steps to block access to information about the personnel, procedures and lethal substance. The

2019 Protocol, for example, states that "any documentation establishing [the] qualifications" of

the personnel involved in the executions "shall be protected from disclosure to the fullest extent

permitted by law." (¶ B.) There is neither a legal basis cited nor any justification for refusing to

disclose proof that such personnel are qualified to perform the complex tasks relating to

executions.

64.     Moreover, the 2019 Protocol gives the BOP director overly broad discretion to

change the procedures for implementing death sentences:

> The procedures utilized by the BOP to implement federal death
> sentences shall be as follows unless modified at the discretion of
> the Director or his/her designee, as necessary to (1) comply with
> specific judicial orders; (2) based on the recommendation of on-
> site medical personnel utilizing their clinical judgment; or (3) as
> may be required by other circumstances.

(*Id.*, ¶ A.) In particular, the ability of the BOP director to make modifications "as may be

required by other circumstances" is so broad as to constitute nearly unfettered discretion.

65.     While the 2019 Protocol provides some vague and high-level information, it lacks

sufficient detail regarding the planned implementation of executions. Specifically, it fails to

address numerous factors that are necessary to ensure compliance with constitutional

requirements, including, but not limited to, the following:

    a.  information about the API supplier and compounding pharmacy to verify whether
        the entities are properly licensed and have a satisfactory track record

    b.  testing of the pentobarbital at regular intervals to ensure, at a minimum, identity,
        purity and potency, and conveyance of test results to condemned prisoners facing
        execution prior to their execution;

c.  the consideration of individualized factors, including health circumstances and medical history;

d.  the manner in which the IV tubing, three-way valve, saline solution or other apparatus shall be modified or repaired in the event it malfunctions during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

e.  the manner in which a monitoring system shall be installed and utilized to ensure that the prisoner is deeply sedated while dying; and the qualifications and expertise required for the person who operates this equipment;

f.  the manner in which the IV catheters shall be inserted into the condemned prisoner, the minimum qualifications and expertise required for the person who is given the responsibility and discretion to decide when efforts at inserting the IV catheters should be abandoned in favor of some other constitutionally acceptable procedure; and the manner in which the condition of the condemned prisoner will be monitored to confirm that the protocol is not inflicting severe and unnecessary pain;

g.  the minimum qualifications and expertise required of the person who is given the responsibility and discretion to order the staff to divert from the established protocols if necessary to avoid inflicting severe and unnecessary pain and suffering, and the criteria to be used in exercising this discretion; and

h.  the minimum qualifications and expertise required of the person who is given the responsibility and discretion to ensure that appropriate procedures are followed in response to unanticipated problems or events arising during the execution, and the criteria that shall be used in exercising this discretion.

## D.    Alternatives Relating to Eighth Amendment Issues

66.    There are at least three alternatives that address the Eighth Amendment issues raised by the 2019 Protocol. Mr. Nelson has identified the alternatives below based on the information available to him, but Defendants have sole possession of information regarding other potential alternatives and they should be ordered to provide it in discovery in this case.

67.    *First*, the implementation of the safeguards alleged in Paragraph 60 above presents a straightforward and available alternative to the defective 2019 Protocol. The DOJ and

BOP should incorporate these safeguards in order to ensure (1) the selection of qualified, competent and vetted team members, whose qualifications are disclosed; (2) establishment of two patent, functioning peripheral IV lines and (a) that no central line will be placed unless it is determined to be necessary following a vein assessment by a qualified medical professional and (b) central lines will be set only by qualified and competent medical professionals; (3) use of FDA-approved pentobarbital or compounded pentobarbital that (a) complies with all state and federal compounding requirements, (b) has been tested, with the records of this testing, chain of custody documentation and (c) the compounding formula disclosed to prisoners and their counsel. Upon information and belief, these safeguards are available, are feasible, and would significantly reduce the substantial risks of harm posed by the 2019 Protocol.

68.     *Second*, the administration of pentobarbital in close proximity to the prisoner, rather than remotely, could reduce or eliminate several of the deficiencies in the 2019 Protocol. Eliminating the need for extension sets of IV tubing can significantly reduce the risks of leakage or pinching of the tubing. Proximate administration would also ensure adequate surveillance and monitoring of the IV, the catheter site and the prisoner. And, by eliminating the need for lengthy IV tubing, proximate administration would greatly reduce the variation and risk introduced by the increased contact, and subsequent resistance, between the drug and the walls of the tubing. Upon information and belief, proximate administration is available, is feasible, and would significantly reduce the substantial risks of harm posed by the 2019 Protocol.

69.     *Third*, along with incorporating safeguards and transparency into the pentobarbital protocol, the DOJ and BOP should add a pre-dose of an opioid such as morphine or fentanyl in a sufficiently large clinical dose. This pre-treatment of the prisoner would substantially reduce the

risk that the prisoner would remain sensate to experience pain, including the pain of pulmonary

edema. Upon information and belief, a pentobarbital protocol with transparency, safeguards and

pre-treatment of an opioid constitutes an alternative procedure that is available and feasible, and

it would significantly reduce the substantial risks of harm posed by the 2019 Protocol.

## VI.    Claims for Relief

### Count I
### (Fifth Amendment Violation — Denial of Due Process)

70.    Mr. Nelson realleges and incorporates herein by reference all of the preceding

paragraphs of the Complaint as if set forth in full below.

71.    The Due Process Clause in the Fifth Amendment requires notice and an

opportunity to be heard before the deprivation of life, liberty, or property.

72.    Defendants, acting under color of federal law, have not disclosed sufficient details

regarding the procedures that will be utilized in carrying out Mr. Nelson's execution pursuant to

the 2019 Protocol, thereby preventing Mr. Nelson from determining all the aspects of the 2019

Protocol that violate provisions of federal law and constitute cruel and unusual punishment and

from consulting medical experts concerning those aspects, and preventing Mr. Nelson from

determining and seeking to remedy the ways in which the 2019 Protocol presents an avoidable

risk of pain and suffering during his execution.

73.    In addition, the discretion given to the BOP Director under the 2019 Protocol to

change the death sentence implementation means that Mr. Nelson will have not sufficient notice

and opportunity to challenge the manner of his execution.

74.    Executing Mr. Nelson pursuant to the 2019 Protocol would violate his rights

under the Due Process Clause in the Fifth Amendment.

22

## Count II
### (Eighth Amendment Violation — Cruel and Unusual Punishment)

75.     Mr. Nelson realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

76.     The Eighth Amendment forbids the Government, in carrying out a death sentence, from inflicting pain beyond that necessary to end the prisoner's life. *In re Kemmler*, 136 U.S. 436, 447 (1890). "Punishments are cruel when they involve torture or a lingering death … something more than the mere extinguishment of life." *Id. See also Baze*, 553 U.S. at 50 (execution violates the Eighth Amendment if it presents a "substantial risk of serious harm").

77.     Defendants, acting under color of federal law, intend to execute Mr. Nelson in a manner that is arbitrary, cruel and/or unreliable, and which will inflict excruciating pain on Mr. Nelson, or has a foreseeable and significant but completely avoidable and unnecessary risk of causing such pain, and where there are alternative methods of execution that are "feasible, readily implemented, and in fact [would] significantly reduce the substantial risk of severe pain." *Baze,* 553 U.S. at 52.

78.     Because the 2019 Protocol poses a substantial risk of serious harm to Mr. Nelson, it violates Mr. Nelson's constitutional right guaranteed by the Eighth Amendment of the U.S. Constitution to be free from arbitrary, capricious, cruel, and unusual punishment.

## Count III
### (Eighth Amendment Violation — Deliberate Indifference)

79.     Mr. Nelson realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

23

80.     The Eighth Amendment forbids "deliberate indifference" to "serious medical needs of prisoners," *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), and to a substantial risk of serious harm to a prisoner.  *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

81.     The BOP undertakes to provide inmates with medical care that is "presently medically necessary," which is defined as treatment "without which an inmate could not be maintained … without significant pain or discomfort." (Fed. Bureau of Prisons, U.S. Dep't of Justice, Program Statement, No. 6000.4 (Dec. 15, 1994), Ch. 1, § 1.)

82.     The Attorney General and the BOP Defendants are required to provide Mr. Nelson with appropriate medical care until the moment of his death. Thus, the Eighth Amendment's proscription against "deliberate indifference" requires that they administer the death penalty without the "unnecessary and wanton infliction of pain." *Gregg*, 428 U.S. at 173.

83.     The means chosen by the Attorney General and the BOP Defendants to execute Mr. Nelson under the 2019 Protocol constitute deliberate indifference to a substantial risk of serious harm to Mr. Nelson.  Mr. Nelson has alleged above several alternatives to the 2019 Protocol that would substantially reduce the substantial harm to Mr. Nelson.

84.     The 2019 Protocol violates rights secured and guaranteed to Mr. Nelson by the Eighth Amendment of the U.S. Constitution.

## Count IV
### (First, Fifth and Sixth Amendment Violations — Access to Counsel)

85.     Mr. Nelson realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

86.     Prisoners have a right under the First and Fifth Amendment of the U.S.

Constitution to access to the courts. *See, e.g., Lewis v. Casey*, 518 U.S. 343, 350-51 (1996); *Wolff*

*v. McDonnell*, 418 U.S. 539, 579 (1974).

87.     Prisoners also have a right under the Sixth Amendment of the U.S. Constitution to

access to counsel at all "critical" stages of criminal proceedings.  *U.S v. Wade*, 388 U.S. 218,

227-28 (1967).

88.     Prisoners have the right to access to counsel throughout the execution procedure.

See *Harbison v. Bell*, 556 U.S. 180, 194 (2009); *In re Ohio Execution Protocol Litig.*, No. 2:11-

CV-1016, 2018 WL 6529145, at **4-5 (S.D. Ohio Dec. 12, 2018); *Cooey v. Strickland*, No. 2:4-

CV-1156, 2011 WL 320166, at **5-12 (S.D. Ohio Jan. 28, 2011); and Arizona Department of

Corrections, Department Order 710 – Execution Procedures, effective June 13, 2017

(https://corrections.az.gov/sites/default/files/policies/700/0710_032519.pdf).

89.     To assert an Eighth Amendment violation prior to or during execution, a prisoner

must be able to communicate that violation to his counsel, and counsel must be able to access the

courts on the prisoner's behalf.  Abridgement of either prisoner-counsel communication or

counsel's access to the courts violates the prisoner's constitutional right to access to counsel and

the courts.

90.     The 2019 Protocol does not provide prisoners with access to counsel during the

execution.  Therefore, under the 2019 Protocol, Mr. Nelson could be deprived of his right of

access to counsel prior to and during the execution and would not be able to communicate with

counsel regarding any problems, including constitutional violations.

91.     In addition, the 2019 Protocol does not permit witnesses (including Mr. Nelson's attorneys or medical consultants) to view the setting of IVs, so that there is no way to identify, object to, challenge, or correct, any issues with the IV- setting process.

92.     The 2019 Protocol's deprivation of access to counsel and the courts prior to and during the execution violates Mr. Nelson's rights under the First, Fifth and Sixth Amendments of the U.S. Constitution.

### Count V
### (Violation of APA — *Ultra Vires* Agency Action Contrary to U.S. Constitution)

93.     Mr. Nelson realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

94.     Under the APA, a reviewing court must set aside any agency action that is "not in accordance with the law," "in excess of statutory jurisdiction, authority or limitations," or "contrary to constitutional right, power, privilege or immunity,"   5 U.S.C. § 706(2)(A), (2)(C).

95.     The Take Care Clause of the U.S. Constitution imposes a duty on the Executive Branch to "take care that the laws be faithfully executed." U.S. Const., art. II, § 3. The Take Care Clause forbids the Executive Branch from making acts of Congress unlawful by refusing to enforce them as written. The Take Care Clause preserves the principles of separation of powers inherent in the U.S. Constitution by preventing the Executive Branch from arrogating to itself the legislative power to revoke or rewrite laws.

96.     Mr. Nelson was sentenced to death pursuant to Section 3594 of the FDPA, 18 U.S.C. § 3594.

97.     FDPA Section 3596 governs the implementation of death sentences under the FDPA and establishes that for all federal executions, the U.S. Marshall "shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed." 18 U.S.C. § 3596 (a).

98.     Section 3596 does not authorize the DOJ or BOP to create a protocol for federal executions under the FDPA.  Nor are the DOJ or BOP authorized under 28 C.F.R. 26.3(a) to implement protocols and procedures for executions that do not specifically comply with Section 3596 of the FDPA.

99.     The 2019 Protocol does not comply with and is in violation of Section 3596 of the FDPA.  Specifically, the 2019 Protocol does not require executions to be "implement[ed] in the manner prescribed by the law of the State in which the sentence is imposed."  To the contrary, the 2019 Protocol, in direct contravention of the FDPA, would allow executions: (i) at the time and place designated by the Director of the BOP; (ii) at a federal penal or correctional institution; and (iii) by injection of a lethal substance or substances under the direction of the U.S. Marshal.

100.     The 2019 Protocol illegally contravenes Congressional intent insofar as it purports to prescribe the manner for execution of prisoners, including Mr. Nelson, who are sentenced to death under the FDPA.  The 2019 Protocol therefore constitutes *ultra vires* agency action because the DOJ and BOP lacked the authority under the FDPA to issue the 2019 Protocol, and also violates the Take Care Clause of the Constitution and the principles of separation of powers.

101.     Accordingly, the 2019 Protocol must be held unlawful and set aside pursuant to the APA, 5 U.S.C. § 706(2)(A) and/or (2)(C).

## Count VII

### (Violation of the APA — Violation of Notice-and-Comment Rulemaking)

102.     Mr. Nelson realleges and incorporates herein by reference all of the preceding paragraphs of the Complaint as if set forth in full below.

103.     The APA requires a reviewing court to set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

104.     The APA required the DOJ and BOP to provide adequate advance notice of the 2019 Protocol, a full and fair opportunity for public comment, and an explanation of the rule ultimately adopted. *See* 5 U.S.C. § 553(b) and (c).

105.     The DOJ and BOP failed to provide advance notice or opportunity for the public to comment on the 2019 Protocol prior to its promulgation. The DOJ and BOP also failed to provide an explanation of why the 2019 Protocol was adopted. In issuing the 2019 Protocol in contravention of such procedural requirements, the DOJ and BOP violated the APA.

106.     The DOJ's and BOP's violation of the APA deprived the public, including Mr. Nelson, of the right to consider and address issues and concerns with the 2019 Protocol that will deprive Mr. Nelson of his constitutional rights, including, but not limited to, Defendants' failure to provide adequate notice of the procedures to which Mr. Nelson would be subjected; the protocol's failure to protect Mr. Nelson's right of access to counsel and the courts; and the risk that the execution will result in an unavoidably painful execution, including the risk of cruel and unusual punishment under the Eighth Amendment, on account of the properties of the pentobarbital, the undefined and unrestricted procedures to be used in the execution, and/or the absence of sufficient safeguards.

28

107.    Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to

5 U.S.C. § 706(2).

## Count VIII

### (Violation of the APA — Arbitrary and Capricious Agency Action)

108.    Mr. Nelson realleges and incorporates herein by reference all of the preceding

paragraphs of the Complaint as if set forth in full below.

109.    Under the APA, a reviewing court must set aside any agency action that is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

U.S.C.§ 706(2)(A).

110.    Agency action that is not the product of reasoned decision-making is arbitrary and

capricious.  *Motor Vehicle Mfrs. Assn of United States, Inc. v. State Farm Mut. Auto Ins. Co*. 463

U.S. 29, 43 (1983). To satisfy the requirement of reasoned decision-making, an agency must

"cogently explain why it has exercised its discretion in a given manner."  *Id*. at 48.

111.    Neither the DOJ nor the BOP has provided any explanation for the adoption of the

2019 Protocol or the procedures contained therein.

112.    The adoption of the 2019 Protocol was not the product of reasoned decision-

making and is thus arbitrary and capricious in violation of the APA.

113.    The DOJ's and BOP's violation of the APA deprived Mr. Nelson of his right to

consider and address issues and concerns with the 2019 Protocol that will deprive Mr. Nelson of

his constitutional rights, including, but not limited to, Defendants' failure to provide adequate

notice of the procedures to which Mr. Nelson would be subjected; the protocol's failure to

protect Mr. Nelson's right of access to counsel and the courts; and the risk that the execution will

result in an unavoidably painful execution, including the risk of cruel and unusual punishment

under the Eighth Amendment, on account of the properties of the pentobarbital, the undefined

and unrestricted procedures to be used in the execution, and/or the absence of sufficient

safeguards.

114.    Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to

5 U.S.C. § 706(2).

### Count IX
### (Violation of the APA — Arbitrary and Capricious Failure to
### Exercise Enforcement Authority under the CSA)

115.    Mr. Nelson realleges and incorporates herein by reference all of the preceding

paragraphs of the Complaint as if set forth in full below.

116.    The CSA makes it unlawful to "dispense" any "controlled substance," 21 U.S.C.§

841(a)(1), except pursuant to a valid prescription "issued for a legitimate medical purpose" by  a

practitioner who is "acting in the usual course of professional practice" and registered pursuant

to the statute.  21 U.S.C. §§ 802(21) and 829(e)(2).

117.    Pentobarbital is a Schedule II controlled substance.

118.    Regulations promulgated by the DEA provide that every person who "dispenses"

a "controlled substance" is required to obtain a registration. 21 C.F.R. § 1301.11. The regulations

also provide that the DEA Administrator "shall deny" an application for registration unless the

issuance of a registration is "required" under the CSA.  21 C.F.R. § 1301.35.

119.    Upon information and belief, the 2019 Protocol calls for the dispensing of

pentobarbital absent a valid prescription and by persons who lack a valid registration. Moreover,

Defendant Dhillon has arbitrarily and capriciously failed to exercise his authority to enforce the

CSA by not requiring the persons who will dispense the pentobarbital to apply for a registration, and will continue to act arbitrarily and capriciously by permitting them to dispense the pentobarbital with doing so or obtaining a valid medical prescription.

120.    Such arbitrary and capricious action violates the APA.

121.    This violation of the APA will cause an injury to Mr. Nelson's interest because, as alleged above, an execution under the 2019 Protocol — with the use of pentobarbital in violation of the CSA — has the substantial probability of resulting in cruel and unusual punishment due to the properties of pentobarbital.

122.    Accordingly, the 2019 Protocol should be held unlawful and set aside pursuant to Section 706(2)(A) of the APA.

## VII.    Prayer for Relief

WHEREFORE, in order to prevent the violations of Mr. Nelson's rights under the First, Fifth, Sixth and Eighth Amendments of the U.S. Constitution, the APA and CSA alleged above, Mr. Nelson respectfully requests that the Court enter a judgment:

a.    declaring that the Defendants' actions, practices, customs, and policies with regard to their means, methods, procedures, and customs regarding executions, and specifically the 2019 Protocol, are illegal and violate the First, Fifth, Sixth and Eighth Amendments of the U.S. Constitution, the APA and the CSA;

b.    vacating the 2019 Protocol and enjoining Defendants and all persons acting on their behalf from using the 2019 Protocol, or any revised protocol that violates Mr. Nelson's rights and the law, for the same

reasons challenged above;

c.      granting Mr. Nelson his reasonable attorneys' fees pursuant to 42

        U.S.C. § 1988 and the laws of the United States; and

d.      granting such further relief as the Court deems just and proper.


Dated:  February 25, 2020            Respectfully submitted,


                                     **CROWELL & MORING LLP**

                                     */s/  Kathryn L. Clune*
                                     Kathryn L. Clune
                                     1001 Pennsylvania Avenue NW
                                     Washington D.C. 20004-2595
                                     (202) 624-2705
                                     kclune@crowell.com

                                     Harry P. Cohen (*pro hac vice* application to be filed)
                                     Michael K. Robles (*pro hac vice* application to be filed)
                                     James Stronski (*pro hac vice* application to be filed)
                                     590 Madison Avenue
                                     New York, NY 10022
                                     (212) 223-4000
                                     (212) 223-4134(fax)
                                     hcohen@crowell.com
                                     mrobles@crowell.com
                                     jstronski@crowell.com

                                     Jon M. Sands   (*pro hac vice* application to be filed)
                                     Dale A. Baich  (*pro hac vice* application to be filed)
                                     Federal Public Defender
                                     District of Arizona
                                     850 West Adams Street, Suite 201
                                     Phoenix, Arizona 85007
                                     602-382-2816
                                     602-889-3960 (fax)
                                     dale_baich@fd.org